UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re:<br><br>Read-Rite Corporation, a Delaware corporation,<br><br>    Debtor. | No. C-06-0364 SC<br>Bankruptcy No. 03-43576 N7<br><br>ORDER AFFIRMING THE BANKRUPTCY COURT'S FINDINGS OF FACT AND <u>CONCLUSIONS OF LAW</u> |

I.  **INTRODUCTION**

    This appeal is before the Court following the December 20, 2005 decision of the Bankruptcy Court sustaining the objection of Appellee Western Digital Corporation[1] ("Appellee" or "Western Digital") to the election of Appellant Seagate Technology Holdings ("Appellant" or "Holdings") to retain, pursuant to 11 U.S.C. § 365(n)(1)(B), any rights it may have had under a non-exclusive patent cross-license agreement between the parties.  For the reasons set forth herein, the Order of the Bankruptcy Court is hereby AFFIRMED.

//

---

[1] Western Digital, as the purchaser of substantially all of Read-Rite's assets, has agreed to serve as Read-Rite's attorney in fact for the purposes of the present dispute.

## II. BACKGROUND

The facts are virtually undisputed. Read-Rite was one of three major suppliers of magnetic recording heads for the hard disk drive and tape drive markets. See Appellants' Appendix Ex. B at 2. Seagate Technology Inc. (hereinafter referred to as Old Seagate) was a manufacturer of hard disk drives and was a customer of Read-Rite. Id. On December 31, 1994, Read-Rite and Old Seagate entered into a cross-licensing agreement ("1994 Agreement" or "Cross-Licensing Agreement") whereby each party agreed to grant the other certain non-exclusive licenses to use its patented technology. Id.

By 1999, it became clear that Old Seagate's value as a company was not being assessed according to its business, but rather according to the successes and failures of Veritas Corporation ("Veritas"). This was because Old Seagate owned a 20% shareholder interest in Veritas, which interest was valued at $10 billion and evidently outweighed the total value of Old Seagate's disk drive business. Id. Old Seagate therefore sought to unhinge its fate from that of Veritas, yet was unable to do so in a straightforward manner without incurring $6 billion in tax liabilities. Id. Old Seagate therefore devised a highly complex series of corporate spinoff and leveraged buyout transactions which, when completed, would "unlock Old Seagate's assets, minimize tax liabilities and reward both companies' shareholders." Id. This is what the parties refer to as the "going private transaction." The Bankruptcy Court described it thus:

> The steps transforming Seagate's corporate structure...must

> be spread forth in order to comprehend the problems they caused under the 1994 agreement with Read-Rite. The first steps occurred in June 2000, with the formation of a subsidiary called Seagate Technology LLC ["LLC"]. Over 95% of the stock in this subsidiary was owned by Old Seagate, and the remainder was owned by one of Old Seagate's wholly-owned subsidiaries, Quinta. On that same date, Old Seagate transferred all of its intellectual property to LLC. Next, on August 10, 2000 Old Seagate formed a wholly-owned subsidiary known as New SAC...New SAC in turn formed wholly-owned subsidiary Holdings, which formed wholly-owned subsidiary Seagate Technology HDD Holdings ["HDD"], which formed wholly-owned subsidiary Seagate Technology U.S. Holdings ["U.S. Holdings"]. New SAC, Holdings, and HDD were incorporated in the Cayman Islands, while U.S. Holdings was incorporated in Delaware. The deal was fully consummated on November 22, 2000, when the following occurred: Old Seagate sold New SAC to new investors and former management of Old Seagate; HDD purchased Old Seagate's interest in Quinta; and U.S. Holdings purchased Old Seagate's 95% interest in LLC. Thus, Holdings...owned the assets of Old Seagate through its 100% ownership of HDD, and through HDD's 100% ownership of U.S. Holdings and Quinta.

Id. at 2-3.

The parties to the 1994 Agreement clearly understood the business realities that cause corporations to avail themselves of the panoply of options with respect to structuring a corporate family. Accordingly, section 3.1 of the 1994 Agreement grants the parties the right to issue sublicenses to their subsidiaries. Section 1.6 of the 1994 Agreement defines a subsidiary as any entity

> more than fifty percent (50%) of whose outstanding shares or securities...are now or hereafter, owned or controlled, directly or indirectly, by a party hereto, but such corporation, company, or other entity shall be deemed a Subsidiary only so long as such ownership or control exists...

Appellee's Appendix Ex. P at 2.

Section 3.1 provides that "[a]ny license granted to a Subsidiary shall terminate on the date such subsidiary ceases to

-3-

1  be a Subsidiary." Id. at 4.  However, a subsidiary that ceases to
2  be a Subsidiary under section 1.6 nonetheless has the right to
3  obtain a replacement license if it receives written approval from
4  its parent, requests the replacement license within 180 days of
5  the date on which it ceased to exist as a Subsidiary, and meets
6  the conditions set forth in section 3.2.  As is relevant to this
7  case, that section requires an entity requesting a replacement
8  license to have all of the following:

> 3.2.1. a line of marketable products;
> 3.2.2. patents or intellectual property relating to the line of marketable products;
> 3.2.3. tangible assets at least equivalent in value to the lesser of twenty-five million U.S. dollars ($25,000,000) or twenty percent (20%) of the total assets of the party of which it was formerly a subsidiary; and
> 3.2.4. at the time of entry into such licence agreement, it is not a corporation, company, or other entity who has...more than fifty percent (50%) of its shares or securities...[owned or controlled by a third party].

See id.

Following the going private transaction, Holdings was not in a position to obtain a sublicense as a subsidiary under section 1.6, but rather had to meet the criteria detailed in section 3 if it was to be entitled to a replacement license.  To that end, on May 18, 2001 Holdings requested by certified letter an operating subsidiary license from Read-Rite.  See Appellant's Appendix Ex. E.  Read-Rite ultimately concluded that Holdings was not entitled to an operating subsidiary sublicense, and thereafter entered bankruptcy proceedings under Chapter 7 of the Bankruptcy Code.

Pursuant to 11 U.S.C. § 365(n)(1)(B), Holdings moved to elect to retain rights it claimed it had by virtue of its purported

-4-

compliance with section 3 of the 1994 Agreement.  Western Digital objected to that election, and the Bankruptcy Court sustained the objection, finding that (1) Holdings had not demonstrated that the original party to the Cross-Licensing Agreement, Old Seagate, consented to Holdings's request for a replacement license as required by section 3.2; (2) Holdings did not "have" a line of marketable products as required by section 3.2.1; (3) Holdings was 100% owned by New SAC, therefore violating section 3.2.4; (4) the doctrine of forfeiture was inapplicable to Holdings's position in this case; (5) Holdings is not entitled to an implied license under the federal patent law doctrine of equitable estoppel; and (6) Read-Rite did not waive its right to enforce its patents.  See Appellant's Appendix Ex. B at 4-10.  The Bankruptcy Court accordingly sustained Western Digital's objection to Holdings's election under section 365(n)(1)(B).  Holdings timely filed this appeal.

### III. **STANDARD OF REVIEW**

In reviewing appeals from Bankruptcy Court decisions, District Courts must apply a clearly erroneous standard to the findings of fact and review de novo the Bankruptcy Court's conclusions of law.  In re Lazar, 83 F.3d 306, 309 (9th Cir. 1996).  The Bankruptcy Court's decision with respect to Appellant's equitable defenses is reviewed for abuse of discretion.  A.C. Aukerman Co. v. R.I. Chaides Construction Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992).

//

//

-5-

**IV.   DISCUSSION**

Appellant's arguments essentially fall into two categories: (1) the Bankruptcy Court erred in determining that Holdings was not entitled to a replacement license under the 1994 Agreement both because a reasonable interpretation of the agreement demonstrates that Holdings qualified as an operating subsidiary, and because even if the plain language did not clearly dictate that Holdings met the definition of an operating subsidiary, California's law of contractual interpretation applies to avoid construing contracts in a manner that results in forfeiture, which, Holdings contends, is precisely what will happen if the interpretation of the Bankruptcy Court is upheld; and (2) even if Holdings does not have the right to receive a replacement license under the 1994 Agreement, the Court should find that Holdings is nonetheless entitled to a license under the doctrines of implied license or waiver.

    A.    <u>Appellant's Right to a Replacement License Under the Cross-Licensing Agreement</u>

Holdings may elect to preserve its right to a license under 11 U.S.C. § 365 only if it actually possessed rights under an executory contract at the time Read-Rite entered bankruptcy. 11 U.S.C. § 365(n)(1)(B). Since Holdings was created some six years after the formation of the 1994 Agreement, and because Holdings does not qualify as a subsidiary of the original party to the agreement, its right to a license under the 1994 Agreement is entirely contingent upon whether Holdings satisfied the requirements of section 3, including meeting the definition of an

-6-

"Operating Subsidiary."[2]

Because the parties do not dispute that Holdings satisfied section 3.2.2, and seem to assume that Holdings satisfied section 3.2.3, the question of whether Holdings met the definition of an operating subsidiary boils down to whether: (1) Holdings has a line of marketable products by virtue of its 100% ownership of HDD, which in turn owned 100% of U.S. Holdings, which controlled LLC, the entity that operated Old Seagate's disk drive business; and (2) whether Holdings has more than 50% of its outstanding shares owned or controlled by a third party.

As to the first question, the Court finds that Holdings did not have a line of marketable products. The Bankruptcy Court reasoned that a straightforward application of the 1994 Agreement yielded the inevitable conclusion that Holdings did not have a line of marketable products. See Appellant's Appendix Ex. B at 5-

---

[2] In addition to qualifying as an operating subsidiary, a party seeking a replacement license under section 3 of the 1994 Agreement was required to receive written authorization from its parent company, and was required to request the replacement license in writing within 180 days from the date on which it ceased to be a subsidiary. The Bankruptcy Court found, and the parties do not dispute, that Holdings satisfied the latter condition when, on May 18, 2001, 177 days after ceasing to be a subsidiary of Old Seagate, Holdings sent its written request for a replacement license to patent counsel for Read-Rite. As for the requirement that Holdings receive written permission from its parent company, the Bankruptcy Court was dubious that Holdings had actually received such written notice, yet did not expressly make such a finding, as the Bankruptcy Court found numerous other points on which to base its conclusion that Holdings was not entitled to a replacement license. For that reason, and because this Court similarly finds resolution of that question unnecessary to the outcome of the Court's review of the Bankruptcy Court's decision, no opinion is expressed as to the question of whether the statements made by Holdings' parent in various corporate filings were sufficient to constitute written consent to seek a replacement license under section 3.

-7-

6. Rather, Holdings was aptly named - it was, after all, a holding company - but it did not directly own anything aside from 100% of the shares of HDD. Further, whereas the 1994 Agreement evidences the willingness of the parties to modify contractual terms with the clause "directly or indirectly," see Appellee's Appendix Ex. P at 2 section 1.6.1, absence of such a clause in section 3.2 gives rise to the inference that the parties did not intend attenuated control of a company that operated a line of marketable products to suffice to meet the requirements of section 3.2.1. The Court finds this reasoning sound, and adopts it as supporting its finding on this point.[3]

However, there is another, equally compelling reason supporting the Court's finding. Under the logic championed by Holdings, there are at least six entities that could be deemed to "have" a line of marketable products: LLC, as the entity that controls Old Seagate's disk drive business; U.S. Holdings, as the entity that controls LLC; HDD, as the entity that owns 100% of the shares of U.S. Holdings; Holdings, as the entity that owns 100% of the shares of HDD; New SAC, as the entity that owns 100% of the

---

[3] More than anyone, perhaps, Old Seagate was aware of the kinds of permutations its corporate structure might undergo one day in response to the myriad pressures of business and regulation, and was thus in the best position to insert language in the Cross-License Agreement that would guarantee its ability to freely obtain replacement licenses for its operating subsidiaries, even where such subsidiaries are mere holding companies. That Old Seagate was unable or unwilling to insert such language in the 1994 Agreement is therefore evidence that, at the time of formation, the parties did not mutually intend that a former subsidiary be deemed to "have" a line of marketable products via indirect ownership of the outstanding shares of a company that operates a line of marketable products.

-8-

shares of Holdings, and the investors in New SAC, as the individuals who actually control New SAC (as Holdings argues with respect to question of which entity owns or controls Holdings for the purposes of section 3.2.4). Certainly the 1994 Agreement does not contemplate any one of several different entities all "having" the same disk drive business, apparently depending merely on who is asking and what the consequences are. An interpretation of a contract that yields plainly absurd results is to be avoided, and the Court therefore rejects Holdings's argument on this point.

The Bankruptcy Court found another compelling reason supporting its finding that Holdings did not qualify as an operating subsidiary under the cross-licensing agreement. Under section 3.2.4, an entity must not have more than 50% of its outstanding shares owned or controlled by a third party if it is to qualify as an operating subsidiary. See Appellee's Appendix Ex. P at 4. The Bankruptcy Court found that Holdings was unable to satisfy this condition because it was a wholly owned subsidiary of New SAC. See Appellant's Appendix Ex. B at 5-6. The Court agrees with this finding, and rejects Holdings's argument that the Court should look past New SAC's 100% ownership of Holdings and find that the individual investors who own New SAC - none of whom own more than 50% of the shares of New SAC - are the entities that actually own or control Holdings.

Nothing in the 1994 Agreement suggests that the parties intended that the requirements of section 3.2.4 apply differently depending on whether the entity that controls the outstanding shares of the operating subsidiary is a small, private company or

-9-

1 a large, publicly traded corporation.[4]  Yet it is precisely this
2 interpretation that Holdings urges, and indeed, is essential to a
3 finding that Holdings satisfied the ownership provisions of
4 section 3.2.4.  The Court finds that while this interpretation
5 might represent what Appellant wishes the 1994 Agreement spelled
6 out, it enjoys no support outside of Appellant's own self-serving
7 logic.  Nothing in the Cross-Licensing Agreement even remotely
8 suggests that the definition of an operating subsidiary should be
9 applied in significantly different ways depending on the corporate
10 structure of the parent company.  Accordingly, the Court rejects
11 this interpretation and finds that Holdings did not meet the
12 definition of an operating subsidiary when it sought a replacement
13 license in 2001.

14 As for Appellant's argument that California law of contract
15 interpretation mandates construing the Cross-Licensing Agreement
16 in such a way as to avoid causing one of the parties to suffer a
17 forfeiture, the Court agrees with the reasoning of the Bankruptcy
18 Court, which found that the law against forfeiture was

---

[4] Appellant argues that its suggested method for determining who actually owns or controls a company seeking a replacement license - that is, looking past the entity that immediately owns the company to the investors in the parent company - applies where an operating subsidiary is owned or controlled by an intermediate holding company like New SAC, but should not apply where the parent company is a large, publicly traded corporation.  See Appellant's Reply Brief at 10.  This methodology is necessary to Holdings' argument because if its suggested interpretation of the requirements of section 3.2.4 were implemented in all scenarios, a publicly traded competitor would likely also satisfy the 50% ownership condition because it is unlikely that any single investor would own more than 50% of the outstanding shares, a result the parties agree would be anathema to the purpose of the change of control provisions of the 1994 Agreement.

-10-

1 inapplicable to the facts of this case, and that even if it was
2 implicated, forfeiture law did not mandate a finding that Holdings
3 qualified as an operating subsidiary.  See Appellant's Appendix
4 Ex. B at 6-8.

5   The Court affirms these findings of the Bankruptcy Court.
6 The Court finds that the law of forfeiture does not apply to save
7 a party from suffering a loss of rights where the only reasonable
8 interpretation of a contract dictates that result.  See Troughton
9 v. Eakle, 58 Cal. App. 161, 173 (Cal. Ct. App. 1922); cf.
10 Milenbach v. C.I.R., 318 F.3d 924, 937 (9th Cir. 2003) ("Where
11 there are two possible interpretations of a contract, one that
12 leads to forfeiture and one that avoids it, California law
13 requires adoption of the interpretation that avoids forfeiture, if
14 at all possible.").  Because the Court does not find that there is
15 any other reasonable construction of the 1994 Agreement except for
16 the one detailed above, the law against forfeitures is not
17 implicated.  Even if forfeiture law is applicable, that law does
18 not operate to allow a court to rewrite the contract or adopt an
19 unnatural construction of its terms.  See Universal Sales Corp. v.
20 Cal. Press Mfg. Co., 20 Cal. 2d 751, 771 (Cal. 1942); Kitchen v.
21 Ballard, 192 Cal. 384, 390 (Cal. 1923).  Accordingly, Appellant's
22 arguments on this point are rejected and the Bankruptcy Court's
23 findings are affirmed.

24     B.   Holdings's Right to Equitable Relief

25   Holdings argues in the alternative that the Bankruptcy Court
26 erred in finding that Holdings did not qualify for an implied
27 license under the doctrine of equitable estoppel.

To establish a right to an implied license under the patent law doctrine of equitable estoppel, a party must prove that

> (1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim...The first element requires the patentee to communicate that "the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged."  Thus, for this form of estoppel, the alleged infringer must have knowledge of the patentee and its patent and must reasonably infer that the patentee acquiesced to the allegedly infringing activity for some time.

Winbond Electronics Corp. v. Int'l Trade Com'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001).

Holdings argues that Appellee's silence in response to a series of four communications from Old Seagate to Read-Rite both prior to and after the going private transaction indicated to Appellant that Read-Rite would acquiesce to Holdings's use of the patents under the 1994 Agreement. See Appellant's Brief at 20-24. The first two of those communications - in October 2000 and January 2001 - evidently informed Read-Rite that Old Seagate intended to assign the Cross-License Agreement to LLC. Id. at 21. Read-Rite apparently did not respond to these communications. Id. In May 2001, Holdings wrote to Read-Rite to formally request a replacement license under section 3 of the 1994 Agreement, and did not receive a response from Read-Rite. Id.  Holdings followed that request with a letter in September 2001 noting Read-Rite's

-12-

failure to respond to the May 2001 request. Id. Prior to sending the September 2001 letter, Holdings phoned Read-Rite to inquire as to the status of the replacement license, and was told by counsel for Read-Rite that a new legal team was in place and no decision regarding the replacement license would be made until a review of all documents could take place. See Appellant's Appendix Ex. B at 5. Read-Rite eventually objected to Holdings' license request in November 2002. See Appellant's Brief at 21.

The Court finds Holdings's argument on this point unpersuasive and affirms the holding of the Bankruptcy Court rejecting Holdings's claim for an implied license. To interpret Read-Rite's silence as an indication that it did not intend to enforce its patents would be unreasonable, and is therefore incapable of supporting an argument asserting a right to an implied license.

Old Seagate's October 2000 letter informing Read-Rite of its intention to assign the 1994 Agreement to LLC did not mention Holdings and does not indicate in any way that Old Seagate would be relying on Read-Rite's willingness to grant a license to the entity that eventually came to control the disk drive business. See Appellant's Appendix Ex. E. Rather, the letter indicates only that Old Seagate was planning on assigning its rights and obligations under the 1994 Agreement to LLC as a part of the going private transaction. Id. However, the 1994 Agreement expressly

-13-

limits the manner in which parties may make assignments under the agreement, and therefore Read-Rite would be justified in believing that Old Seagate would comply with section 9.1 of the 1994 Agreement if it indeed intended to participate in a valid assignment.

Furthermore, following the May 2001 letter formally requesting a replacement license, Holdings was informed that Read-Rite would not take action on the request until after its new legal team had an opportunity to review all pertinent documents. How Holdings could genuinely have formed the belief that Read-Rite would not object to Holdings's use of Read-Rite's patented technology from the communications between the parties is beyond comprehension. At the very least, the Court finds that Read-Rite's conduct with respect to the communications between the parties did not create a reasonable inference that it would not object to Holdings's use of its patented technology.

The Court finds that the determination of the Bankruptcy Court that Holdings did not demonstrate that it relied on Read-Rite's silence to its detriment did not constitute an abuse of discretion and is therefore affirmed.

With respect to the question of whether Appellant could demonstrate reliance on Read-Rite's silence, the Bankruptcy Court found that the structure of the going private transaction was "already a fait accompli" by the time Old Seagate sought Read-

-14-

Rite's approval. Appellant's Appendix Ex. B at 9. According to the Bankruptcy Court, Appellant was relying on "unilateral expectations or at most, reasonable hopes that Read-Rite's approval would be forthcoming, nonwithstanding their failure to meet the requirements under the cross-licensing agreement. Read-Rite's conduct played no part in Seagate's actions." Id.

Appellant argues that the Bankruptcy Court erred in finding that Holdings did not establish that it relied on Read-Rite's silence to its detriment, because, Holdings contends, it "expand[ed] its control of LLC's infringing disk drive business during the Debtor's two-year period of inaction." Id. at 24.

This Court finds that the Bankruptcy Court's findings with respect to whether Appellant actually relied on Read-Rite's conduct are not clearly erroneous, and that the Bankruptcy Court's declination to award Holdings an implied license under the equitable estoppel doctrine was not an abuse of discretion. That finding is therefore affirmed.

Finally, with respect to Holdings's argument that Read-Rite waived its right to enforce its patents by failing to respond to Old Seagate's and Holdings's communications, the Bankruptcy Court found that Appellant had failed to provide any evidence of waiver whatsoever, much less "clear and convincing" evidence, and that Holdings was therefore not entitled to a license under that theory. See Appellant's Appendix, Ex. B at 9-10.

-15-

Holdings argues that the Bankruptcy Court erred in applying the "clear and convincing" standard for proof of waiver, and that, where the right to effect a forfeiture is involved, "slight evidence of waiver of a right to compel forfeiture is sufficient." Appellant's Brief at 26. Holdings asserts that Read-Rite's silence is more than sufficient to meet the "slight evidence of waiver" standard. Id.

The Court disagrees. Given the Court's interpretation of the 1994 Agreement finding that the facts of this case do not involve a forfeiture, the "slight evidence of waiver" test is inapplicable. However, even if it were applicable, the Bankruptcy Court expressly found that there was "absolutely no evidence...that Read-Rite intended to give up its right to enforce the terms of the cross licensing agreement when it failed to respond to Holdings's letters." Appellant's Appendix Ex. B at 10. The Court finds that this finding of fact is not clearly erroneous, and therefore affirms the finding of the Bankruptcy Court that Holdings is not entitled to a replacement license under a theory that Read-Rite waived its right to enforce its patents.

//

//

//

//

-16-

**V.   CONCLUSION**

For the reasons set forth above, the order of the Bankruptcy Court sustaining Appellee's objection to Appellant's election under 11 U.S.C. § 365(n)(1)(B) is AFFIRMED.

IT IS SO ORDERED.

Dated: May 5, 2006     
_____

UNITED STATES DISTRICT JUDGE

-17-